UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 02-295(01)(JRT/RLE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD PINDYCK,<br><br>Defendants. | POSITION OF THE PARTIES WITH RESPECT TO SENTENCING FACTORS |

The United States of America submits its position with respect to sentencing. The United States accepts the presentence reports' factual statements and the guideline calculations. The United States objects to any departure or variance downward in this case.

**Statement of Facts**

By at least 1996, defendants Howard Pindyck, Philip Bruno, and Michael Czichray agreed to open chiropractic clinics in the Twin Cities metropolitan area. These clinics targeted minority and immigrant populations. Leonard Evangelist and other chiropractors were hired to staff the offices.

The defendants' plan was to recruit patients who had been involved in automobile accidents. These patients would provide the defendants with their automobile insurance information. Under Minnesota's no fault insurance laws, the insurance companies were required to pay for medically necessary chiropractic treatment. Once the defendants had received a

patient's insurance information, the defendants proceeded to submit claims to the insurance companies that did not accurately reflect the treatment provided to patients. The defendants would then place the patients on a standard treatment plan that was identical for each patient, regardless of the diagnosis or prognosis.

An FBI cooperating witness visited one clinic on multiple occasions, recording each visit. After the "treatments," the defendants submitted insurance claims to an insurance company that was cooperating with the FBI. Later on, the CW's wife also became a patient of the defendants. As a result of these visits, the FBI confirmed that the defendants regularly submitted false and fraudulent bills for services that were not performed, were not performed in the manner and to the extent claimed, or were not medically necessary. In all, the defendants billed 94 treatments for the CW, when the CW received 8 treatments. The defendants billed 63 treatments for CW's wife, when she only received 1 treatment. The treatments that were provided were medically unnecessary.

The FBI continued its investigation by executing search warrants and interviewing clinic employees. This investigation revealed that the defendants, specifically Bruno and Pindyck, had established a billing system that billed insurance companies for

the same treatments for all patients, regardless of the patients' actual medical needs and regardless of the treatment actually provided to the patients. The defendants would reduce the number and type of treatments on bills submitted to insurance companies over time to represent that the patients were improving, again regardless of the treatment actually provided to the patient or the patients' actual medical condition.

Clinic employees and patients stated that Pindyck, Czichray and Evangelist would sign the names of patients to sign-in sheets and intake forms, to make it appear as though a patient had visited a clinic and received treatment, when in fact the patient had not visited the clinic and received that treatment. Pindyck and Czichray would also create and direct other persons to create patient treatment documents and records falsely documenting that treatment had been provided to patients, which records would be used to justify bills submitted to the Insurance companies.

In essence, office personnel would create chiropractor's treatment notes (aka SOAP notes) based on the predetermined billing plan. Contrary to Minnesota state law, these notes did not document the care actually provided to the patient, or contain specific information required by statute. The defendants would submit these notes to insurance companies, falsely representing that the notes were accurate.

Insurance companies visited the defendants' clinics to investigate the large spike in claims from these clinics. In response to these visits, Pindyck and Czichray concealed the fraudulent scheme by creating and submitting to the insurance companies false and fraudulent documents which falsely stated the care, if any, provided by a chiropractor to a patient on a particular day. Clinic employees state that Pindyck, Czichray and Evangelist told patients to lie to insurance companies, to support the claims submitted by the defendants to the insurance companies.

Although the defendants' patients regularly walked into the clinic during work hours, the defendants would falsely claim the patient was severely injured and needed intensive medical care. The defendants' internal contemporaneous patient notes do not support submitted claims. When comparing "½ sheets" seized in the search warrant with submitted claims, only 50% of the defendant's claims are supported by the contemporaneous "½ sheets."1

**Calculation of Loss Amount**

During July 2002, the government contracted with an independent auditing firm, Eide Bailly LLP, to conduct an audit

[1] ½ sheets" were used by the defendants to document the treatments provided to a patient.

of claims submitted by the defendants' chiropractic clinics. The audit focused on claims submitted to five insurance companies: Progressive, MSI, MetLife, Allstate, and State Farm. The audit used a statistically valid sample of randomly chosen claims. The defendants submitted claims to additional insurance companies, but these claims were not included within the target sample for the audit. Eide Bailly randomly selected a sample of 400 claims from 7,949 patient visits. These claims involved 133 patients.

Although the defendants' fraudulent scheme began in approximately 1996, the audit sample was restricted to claims filed between July 1997 and April 2001. The audit excluded the first year of the defendants' scheme.

When conducting the audit, Eide Bailly discovered "substantial evidence that the documents and claims prepared and submitted by the clinics were abusive and/or fraudulent." (EB at 1.2). Eide Bailly discovered numerous additional instances of potential fraud, including instances where:

(1) patient notes reflected treatment for a patient which occurred ***prior to*** the accident that caused the injury (EB at 6),

(2) patient cards which documented when patients appeared at the clinic appeared to be altered or manipulated (EB at 7),

---

[2] EB at 1 refers to the Eide Bailly audit report, page 1.

(3) initial consultation notes for ***all*** patients were "almost exactly the same" regardless of the patients' medical condition (EB at 7),

(4) progress notes and bubble sheets with pain rating scales all followed exact patterns, regardless of the patients' prognosis (EB at 8),

(5) many patients appeared to have the same handwriting, when signing in on patient sign in sheets (EB at 8), and

(6) the defendants claimed that a 3 year old boy "presented himself for consultation in our office" after a severe car accident, but denied "sexual dysfunction." (EB, Work Papers, Vol II).

Despite overwhelming and conclusive evidence that the patient files were replete with fraudulent and false documents, Eide Bailly assumed, for purposes of the audit, that the files accurately reflected the treatment provided to patients. (EB at 1). In other words, even where the defendants submitted a claim for injuries allegedly sustained ***before*** the car accident (see example 1 above), Eide Bailly treated those injuries as valid and attributable to the car accident.

After examining the 400 claims, Eide Bailly determined that 49% of the claims were fraudulent. (EB at Exh. E).

> The findings were not only extensive and wide-spread, but also did not conform to many of the "usual rules" we tend to follow in the health care arena (i.e. signing documentation, individualizing care, providing care within the Standards of discipline, etc.). Conservatively, we recommend that 49% of the total claims that occurred with these 133 patients be denied.
>
> We also found the record keeping containing constant errors and discrepancies. . . . Everything from the sign-in sheets to the visit documentation (or lack of), to the claims themselves were suspect. Again, with the number of discrepancies that were found, it is difficult to establish any credibility in these chiropractic clinics.

EB at 12.

Eide Bailly made this determination by comparing the care purportedly provided to the patients to the standard of practice in the chiropractic community. In essence, Eide Bailly discovered that the defendants were routinely billing for medically unnecessary care, which care was not covered by no-fault insurance policies. Eide Bailly's audit findings directly substantiated evidence provided by clinic employees that the defendants did not care about the patient's condition or prognosis, but were focused on billing insurance companies the maximum extent possible.

After applying the 49% loss rate to the total claim population, Eide Bailly conservatively estimated the loss attributable to the defendants' fraud at $440,311.60. This is a conservative and reasonable estimate of the loss.

With respect to determining loss, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, application note 2(C). "[A]lthough the sentencing court is not expected to determine the fraud rate and attributable loss with precision, it should make a reasonable estimate of the loss, given available information." *United States v. Wells*, 127 F.3d 739, 748 (8th Cir.1997); *United States v. Erhart*, 415 F.3d 965, 970 (8th Cir. 2005) . The government must prove the amount of fraud loss by a preponderance of the evidence. *United States v. Coon*, 187 F.3d 888, 899 (8th Cir.1999).

In cases involving repeated and pervasive fraud, a Court may apply a reasonable fraud rate to estimate the approximate losses. The court may base its loss estimate on the approximate number of victims and an estimate of the average loss to each victim. U.S.S.G. § 2B1.1, application note 2(C). In *United States v. Berndt*, 86 F.3d 803 (8th Cir. 1996), the Eighth Circuit recognized that fraud cases involve deceit and secrecy, making it unlikely that the government can always identify the full scope of the offense with specificity. In *United States v. Chichy*, 1 F.3d 1501, 1509 (6th Cir. 1993), the Sixth Circuit approved the

District Court's use of "average loss" information to determine the amount of loss. Other cases note that a sentencing court may calculate loss by making a reasonable estimate of the range of the loss. See *United States v. Narvaez*, 995 F.2d 759 (7th Cir. 1993); *United States v. Brandon*, 17 F.3d 409, 457 (1st Cir. 1994); *United States v. Gomez*, 31 F.3d 28 (2d Cir. 1993); *United States v. Sutton*, 13 F.3d 595 (2d Cir. 1994).

Statistically valid samples are an appropriate means to determine loss in a fraud case. *United States v. Scalia,* 993 F.2d 984, 989 (1st Cir.1993);*United State v. Rostoff,* 53 F.3d 398, 407-408 (1st Cir. 1995) (bank fraud); *United States v. McAlpine,* 32 F.3d 484 (10th Cir. 1994); *United States v. Sutton,* 13 F.3d 595 (2d Cir. 1994) (bribery).

The sample used in this case was a random sample targeting all claims submitted by the defendants to five insurance companies. This audit conservatively estimated the losses caused by the defendants in that:

1. It only examined claims from 5 insurance companies, instead of all insurance companies to whom the defendants submitted claims;

2. It did not examine claims from 1996 to 1997; and

3. It assumed that the patient files accurately reflected the treatment provided to patients, despite overwhelming evidence that the patient notes were false and fraudulent.

Attached to this paper is Eide Bailly's summary report of its audit. The government will present evidence at the sentencing hearing to establish the loss amount attributable to the defendants.

**Conclusion**

Although Howard Pindyck was not a chiropractor, he was the energy behind this fraudulent chiropractic billing scheme. But for his operation of the billing office, the fraudulent billing scheme would have failed. The losses caused by his and his co-conspirators' scheme are well in excess of $400,000. Therefore, a sentence within the guideline range determined by is appropriate.

Dated: 9/20/06

Respectfully submitted,

RACHEL K. PAULOSE
United States Attorney

*s/ John R. Marti*

BY: JOHN R. MARTI
Assistant U.S. Attorney