# REPORT REQUESTED BY DEFENSE

## US vs. PINDYCK

Submitted by Joel B. Wulff, DC

December 29, 2006

## INTRODUCTION

This audit review was performed at the request of defense counsel in the above matter for an evaluation and response to the "Chart and Claim Audit Report of Findings and Recommendations" document produced by Eide Bailly LLP (hereinafter Government's Audit). Numerous patient files provided and other discovery contained on DVDs were also reviewed.

The Government's Audit concludes that there is a loss amount of $402,071.60 attributable to the fraud of the defendants. It is my opinion that the actual loss amount attributable to fraud is at least $334,317.20 less than that amount (or a total of $67,754.40) for the reasons set forth below.

My opinion is based upon my review of the above documents as well as my experience as a licensed chiropractor in Minnesota. In addition to treating patients I have had substantial experience reviewing both records and billing practices as they relate to chiropractic cases in the State of Minnesota. I performed those reviews first as the Executive Director of the Minnesota Board of Chiropractic Examiners from 1989 to 1993, as a consultant to practicing Chiropractors in the state and as a case reviewer for the insurance industry.

## THE GOVERNMENT'S AUDITORS

The reviewers who performed the Government's Audit are Nurses who are licensed in the State of North Dakota.

They appear to have extensive experience in the areas of Medicare reimbursement and private third-party pay (general health) insurance training and review. They rely upon chiropractic treatment guidelines and the opinions of practitioners employed by Minnesota No Fault Insurance Carriers for their determination of the necessity of the care that was provided. None of the reviewers are Chiropractors, have licenses in the State of Minnesota or indicate that they have any reason to be familiar with the laws governing Chiropractic in the state, the laws governing health care provided under Minnesota No Fault Automobile Insurance in the state or the community standards of practice for Chiropractic in the State of Minnesota.

**INDEPENDENT MEDICAL EXAMINATIONS**

The Government's Audit erroneously attributes a loss amount of $176,845.20 to 1,707 patient visits disallowed because they follow a determination by an independent medical examiner (IME) that chiropractic care was no longer medically necessary. These assumptions are fatally flawed because the Government's Auditors appear to have no understanding of the Minnesota No Fault Insurance system. Accordingly the entire $176,845.20 loss amount must be discarded.

This figure is arrived at through the use of Exhibit D to the Government's Audit. The total amount of office visits disallowed for "IME" reasons is 1,707. The total number of those office visits was then multiplied by $103.60 (the average cost per office visit determined by the Government Auditors in Exhibit E to the Audit) to arrive at a figure of $176,845.20.

The Automobile Insurance carriers in Minnesota are allowed to have a provision in their policies that mandates an insured's cooperation when ordered to attend an IME. This provision addresses the requirement of the insurance carriers to pay for reasonable costs of care necessary to treat injuries that occur during an accident. Since the injured party can seek out the care of providers that may be sympathetic to their needs, the insurer was provided the ability to seek out health care providers that may be more sympathetic to the interest of the insurer (the IME doctors). Companies that become a resource for the Automobile Insurers employ the IME doctors. These intermediary companies rely upon IME doctors to consistently provide reports that meet the needs of their clients (Automobile Insurers) and therefore remain competitive in the market place. The bottom line is that Automobile Insurers seek an opinion from a licensed health care provider that indicates their insured does not need care or that the care is not causally related to an accident for which they offer coverage. The IME market is interested in the doctors who most consistently have an opinion that patients are either not in need of care or have conditions not related to the accident in question. In this situation this opinion allows that insurance carrier to discontinue benefits.

There are a number of factors in the Minnesota No Fault Insurance system that make reliance upon IME reports for the purpose of determining insurance fraud highly suspect. An Independent Medical Examination is not considered to be medical care. The IME Doctor is immune from damages arising from his or her medical opinion. IME

Doctors are highly paid advocates for the financial interests of the insurance companies who employ them; they have a vested interest in providing medical opinions that will result in their continued employment.

The vast majority of Independent Medical Examinations conclude that medical care is no longer necessary or that the patient's injury is not related to the accident. In other words the Independent Medical Examiners opinion is almost always adverse to the interests of the injured party. When such an IME determination is made in Minnesota the Insurance Company immediately discontinues paying for medical care. Those decisions are then taken to arbitration. It is extremely common in Minnesota for an Arbitrator to Order the Insurance Company to continue to pay for medical care notwithstanding their IME opinion to the contrary.

The Government's Auditors appear to have no understanding of the above issues. This helps explain their blind determination that all treatment following an adverse IME determination is fraud. Accordingly the entire amount disallowed on IME grounds by the Government Audit should be discarded.

## STANDARDS OF PRACTICE

The Government's Audit erroneously attributes a loss amount of $150,220 to 1,450 patient visits disallowed because they exceed the Minnesota Chiropractic Association Standards of Practice guidelines.

This figure is arrived at through the use of Exhibit D to the Government's Audit. The total amount of office visits disallowed "based on Standards" is 1,450. The total number of those office visits was then multiplied by $103.60 (the average cost per office visit determined by the Government Auditors in Exhibit E to the Audit) to arrive at a figure of $150,220.

The Audit Report cites three documents that it indicates were used as benchmarks for evaluation of treatment provided during the review of cases. In the "Concluding Statements" the Minnesota Chiropractic Association Standards of Practice document is noted as the reference from which assertions were made. The other documents were clearly not used and will not be specifically addressed but the general comments made are applicable to those documents.

The generation of "standards of practice" for chiropractic was initiated to give some guidelines to individuals outside the profession of what to generally expect with regards to treatment duration and frequency based upon a diagnosis. As no double blind studies exist for chiropractic care a consensus process was used. This process polled some number of providers and asked what was the typical duration and frequency of care for certain conditions. The results were compiled and discussed with hopes that a consensus could be reached. With this method the larger the body of contributions and the greater the group reviewing the data the more useful the document proved to be. In the case of the Minnesota Chiropractic Associations Standards of Practice no analysis of

practice numbers occurred, no meaningful consensus process was carried out and the Association at large did not ratify the document.

A chiropractic treatment protocol is not a benchmark but more of an indicator of when treatment should be reviewed. Disclaimers are present in the documents which indicate case by case review is necessary to evaluate the true need of patients. An individual patient will respond differently based upon age, health, compliance with limitations and instructions, work activities, recreational activities, previous injury, nutritional health and concurrent conditions. Each of these factors must be taken into account with actual patient management and addressed by the provider. Things as innocuous as a poor mattress that creates biomechanical stress on an injured low back will vary healing times and treatment needs by a statistically valid amount.

The treatment protocols over all are designed to be indicators of when treatment should be questioned, not when it should have been completed. In order to make a meaningful decision regarding the need for ongoing care (or whether care is justified) a case must be reviewed taking into account the above-mentioned factors and other clinical information. To use any treatment protocol, especially one as tenuous as the Minnesota Chiropractic Associations Standards of Practice document, to determine when care should have been stopped is simply not justifiable or defensible.

No charges can be discounted as fraudulent (or for unnecessary care) based upon any treatment protocol. The protocol is an indicator of when further review may be necessary. Each case must be individually evaluated to determine the need of the care provided. The Automobile Insurance carriers have the ability to obtain records and review cases to determine if bills are appropriate. They can, and do, deny payment for some services on an item-by-item basis. An IME examination can, and often is, ordered to determine if ongoing care is warranted. All of the decisions made from these processes can be reviewed through an established and regulated arbitration process. The system does not give any weight to the guidelines mentioned in the Audit report, even to the extent that Insurance Carriers consider exceeding a guideline as justification for review of charges, much less justification for a denial of charges. To take any of the guidelines noted, especially the Minnesota Chiropractic Association Standards of Practice, and use them to establish a date after which charges were abusive, much less fraudulent, is not defensible.

Accordingly the entire amount disallowed by the Government Audit “based on Standards” should be discarded.

## SIGN IN SHEETS

The Government’s Audit erroneously attributes a loss amount of $7,252 to 70 patient visits disallowed because of “no signatures on the sign in sheets”.

This figure is arrived at through the use of Exhibit D to the Government's Audit. The total amount of office visits disallowed base on "no signatures on the sign in sheets" is 70. The total number of those office visits was then multiplied by $103.60 (the average cost per office visit determined by the Government Auditors in Exhibit E to the Audit) to arrive at a figure of $7,252.

The "sign in sheet" is cited in a number of cases as being inconsistent or having questionable signatures. The sign in sheet is an internal document used in some offices (more often in the past) to assist the staff in a number of areas. First, the order of the names allows the staff to track who has been there the longest and call them for appointments in an appropriate order. Second, signing the list assures the patient that staff does know they are waiting, even if the staff is busy. Third, the sign in sheets allow the patients to see how busy an office may be (a practice affected by recent changes in privacy regulations but not addressed at the time of the documents in question). Fourth the sign in sheet is useful in a busy office for front desk staff to keep track patients if they have other duties. Finally, but least reliable, the sign in sheet, when signed by the patient, provides independent confirmation of their appointment.

To use the sign in sheet for anything but the confirmation of appointments it is immaterial who signs the sheet (particularly with patients who do not speak or write English as a primary language). Internal flow of patients does not require an original signature but does benefit from some consistency in having the name entered. I have not seen any assertion or cross reference to the sign in sheet to justify charges that were made.

The assertions that the suspicious handwriting or inconsistency of names on the sign in sheets indicates that services were charged for but not rendered are not supported by the typical use of sign in sheets. When the typical use of sign in sheets is known, these inconsistencies make perfect sense and are clearly meaningless to a clinical audit.

**MISCELLANEOUS**

There are a number of other problems with the Government's Audit. The following points summarize some of those problems. Because of limitations on my time I have not determined what dollar amount of the Government Audit's fraud figure is impacted by these problems.

- Choosing 400 visits and 133 patients to determine if further review of practices is necessary is a defensible number for an audit. The findings from such a review may indicate practices that warrant further review but in no way can anything but a complete review of cases and visits be used to determine the number of charges that could be considered fraudulent.
- The 16 duplicate visits can be explained by the multiple records kept on patients for administrative purposes. While this practice is not efficient is does not in itself constitute fraud. In order to constitute fraud the services must not have been

rendered and charges must have been sent to the insurer. The report does not state these events occurred.

- The notation that 64 visits did not have copies of the claim forms is immaterial. The claim form is a billing form. At no time is it required that a copy of this form be included in the records of patients. The billing information is maintained in a patient accounting system and retaining the claim form in the patient file is redundant. In order to audit these claims the billing system should have been accessed and reviewed.
- The laws governing the practice of chiropractic in the State of Minnesota require that services provided be documented in the patient record and billed for. The percentage of visits with 4 or more modalities and 3 or fewer modalities is immaterial if the services were rendered. The number of services provided is determined by a doctors practice beliefs and those percentages are not outside the continuum of typical practice related to recently injured patients (the type of case reviewed here).
- Referrals for neurological consultation are not unusual in patient management. Sixty five out of 133 referrals is not an unusual number in the management of recently injured patients. Developing a relationship with certain practitioners and clinics is not unusual in any type of healthcare practice. In order to scrutinize the value of the referrals a case by case review of the clinical facts would be necessary.
- The timing of a referral for neurological consultation is dependent on a patient's clinical findings and progress under the referring practitioners care. The described referral pattern indicates a conservative referral protocol that does look at progress made and changes in clinical findings. A more aggressive or very consistent referral pattern would be more suspicious. In order to evaluate the judiciousness of the referrals a case by case review would be necessary.
- During the time in question MRI imaging was becoming the gold standard in objective evaluation of connective tissue injury. Fifty MRI referrals out of 133 cases is not outside the normal range of management in these types of cases. Developing a relationship with certain facilities is not unusual in any type of health care practice. Often the relationship develops based upon the location of the facility, the ease of making appointments and speed of sending out reports.
- The use of Independent Medical Examinations (IME) results or the Minnesota Chiropractic Association Standards of Practice guidelines when determining the need for care has been discussed extensively elsewhere in the document. The use of either of those sources as a defensible reason for determining that care was not justified, much less fraudulent, is indefensible. The findings in the audit that chiropractic care, MRIs, sonograms or neurology referrals should be "denied" are therefore indefensible.
- The use of "bubble forms" and the potential meaning of the numbers on those forms is misunderstood in the Government Audit. Bubble forms are often stored in the patient files in small quantities (often from a box of forms that would result in the stack being stored having sequential numbers). My review of the forms showed that an individual patient file may contain 2 or 3 short "stacks" of the bubble forms with sequential numbers with the number series on each "stack"

being widely spaced. This does not indicate that the forms were filled out for several visits at one time as the Audit Report indicates.

- The conclusion of the Government Audit contains two observations. One, that based upon IME opinions and the Minnesota Chiropractic Association Standards of Practice guidelines care was paid for that was not the liability of the insurance companies that were charged. That determination is made in Minnesota first through an arbitration process and secondly in the civil courts. To state that charges associated with this care constitute fraud is indefensible. Second, that the sources cited can be used as benchmarks to determine when care became unnecessary or fraudulent. Both IME results and the Minnesota Chiropractic Association Standards of Practice guidelines are discussed at length elsewhere in this document. In summary, using either of those sources to determine not only the necessity of care provided but whether the charges were fraudulent is not defensible.
- The costs presented in the Conclusion portion of the Audit are arrived at using indefensible benchmarks and should be discounted entirely. The only costs that can be attributed to fraud are those directly linked to charges for services not rendered.

**CONCLUSION**

For the foregoing reasons it is my opinion that the $402,071.60 loss amount determined by the Government's Auditors should be discounted to at least $67,754.40. For the reasons contained in the preceding "Miscellaneous" section of this report it is my opinion that the actual loss amount is substantially less than $67,000.